IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

Bruce D. Saellam,                                    )
                                                     )
                    Plaintiff,                       )
                                                     )
        vs.                                          )        Civil Action No.  06-0123
                                                     )
Norfolk Southern Corporation, Norfolk                )
Southern Railway Corporation,                        )
                                                     )
                    Defendants.                      )


AMBROSE, Chief District Judge


**OPINION**
**AND**
**ORDER OF COURT**

        Plaintiff, Bruce Saellam ("Plaintiff"), initiated this action against Defendants Norfolk Southern

Corporation and Norfolk Southern Railway Corporation ("Defendants" or "Norfolk Southern"), alleging

discriminatory treatment on the basis of national origin and age in violation of Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII") and the Age Discrimination in

Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"), retaliation under Title VII and the ADEA, and

pendent state claims under the Pennsylvania Human Relations Act, 43 Pa. Stat. § 951, *et seq.*

("PHRA").[1]

        Pending before the Court is Defendants' second motion for summary judgment seeking

dismissal of Plaintiff's claims in their entirety.  (Docket No. 33).  After careful consideration of the

parties' submissions and for the reasons set forth below, Defendants' motion is granted.

---

[1]  In his Brief in Opposition, Plaintiff represents that he agrees to the dismissal of his age claims.
Pl.'s Br. Opp. (Docket No. 39) at 1, n.1.  Accordingly, Defendants' Motion for Summary judgment is
granted as to Plaintiff's ADEA and corresponding PHRA claims.

# I.  BACKGROUND

## A.  Factual Background

Unless otherwise indicated, the following material facts are undisputed.

### 1.  Plaintiff's Employment History With Norfolk Southern

Plaintiff, Bruce Saellam (pronounced "Salem"), is a resident of Westmoreland County, Pennsylvania.  Plaintiff's father, James George Saellam, is an American citizen born in New Kensington, Pennsylvania, and, according to Plaintiff, is of Syrian descent.

Plaintiff has been employed by Norfolk Southern since June 1, 1999, and prior to that was employed by Consolidated Rail Corporation ("Conrail").  At the time Plaintiff became a Norfolk Southern employee in June 1999, he was employed as a terminal trainmaster, a non-union position.  Prior to this, Plaintiff had been employed at Conrail as a train dispatcher, a union position.  On February 1, 2003, Plaintiff exercised his seniority and returned to a union position as a train dispatcher for Norfolk Southern.

Mark Hamilton became Superintendent of Norfolk Southern's Pittsburgh Division in November, 2003.  Plaintiff alleges that shortly after assuming the Division Superintendent position, Hamilton said to him "Why do you have all of these American Flags on your car, is that so people don't think you are a terrorist?"  Plaintiff also alleges that following a safety briefing concerning terrorism, Hamilton approached him and asked how he felt about terrorism.  According to Plaintiff, Hamilton did not ask anyone else about their thoughts on terrorism.  Plaintiff further alleges that his supervisor, Jim Keller, mispronounced his name in the summer of 2003 in such a way as to emphasize a Middle Eastern pronunciation.

On October 27, 2004, Plaintiff was working the afternoon shift which begins at 2:00 p.m. as train dispatcher in the Pittsburgh Division's office in Greentree, Pennsylvania.  Plaintiff was relieving a relatively new train dispatcher, Gary Bowling.  At the time, Bowling was a probationary

employee, meaning he was still in a learning process and was not subject to all of the rights and obligations afforded to non-probationary employees under the applicable labor agreement, including the agreement's disciplinary procedures. Sometime during his shift, Plaintiff became aware that Bowling had made an error during the prior shift and had altered information contained on the daily dispatcher bulletin. Specifically, Bowling had mistakenly changed the date on certain bulletin orders from October 27, 2004 to October 28, 2004. As a result, the bulletin did not properly notify train crews regarding certain track work that was occurring on October 27, creating a safety concern. According to Plaintiff, he first became aware of Bowling's error at approximately 3:10 p.m. on October 27 when he was contacted by one of the trains operating in his territory. Plaintiff took some action to notify other trains in the affected area and eventually advised the Chief Dispatcher on site at the time, Ken Opalanko. As of 4:00 p.m. on October 27, 2004, any danger caused by the mistake had passed because at that point in time the information on the bulletin order was no longer incorrect.

Upon learning of the situation from Plaintiff, Opalanko took a number of actions on October 27. He got a copy of the relevant bulletin orders. He also reviewed the form D book and saw that Plaintiff had not issued a form D, line 5.[2] Opalanko also testified that he reviewed the mandatory directive book on both October 27 and October 28, 2004, and that when he reviewed the mandatory directive book on October 27, there were no entries indicating that Plaintiff had issued mandatory directives. When Opalanko looked at the mandatory directive book on October 28, however, there were entries indicating that Plaintiff had issued mandatory directives. On the following Sunday, October 31, 2004, Plaintiff showed Opalanko the entries in the mandatory directive book and represented to Opalanko that he had made those entries at the time he issued the mandatory

---

[2] A Form D, Line 5 basically is a formalized process for a train dispatcher to make train crews aware of a change in condition that exists out on the railroad relative to some track work that is occurring. See Pl.'s App. Ex. B (Young Dep.) at 17.

directives on October 27. Opalanko testified that he listened to the tape recording of the communications between Plaintiff and the train crews and based on those recordings, concluded that Plaintiff did not issue mandatory directives.

Opalanko initially charged Plaintiff with failure to issue a Form D by letter dated October 28, 2004. See Defs.' App. Ex. 10. Opalanko issued a revised notice of hearing on November 4, 2004 which included the failure to issue a Form D charge along with two additional charges: (1) conduct unbecoming an employee related to falsification of mandatory directive records and (2) providing false and/or conflicting statements to Opalanko. See id. Ex. 11.

An investigative hearing on all three charges was conducted on November 12, 2004 by hearing officer James Young.[3] As a hearing officer, it was Young's duty to conduct a fair and impartial investigation of the facts involved in the case and to make a decision on the appropriate discipline.[4] At the time of the hearing, Young did not know Plaintiff's national origin. Following the hearing, Young concluded that Plaintiff was responsible for all three alleged violations and determined that termination of employment was the appropriate discipline. See Defs.' App., Ex. 5 (Young Dep.) at 53, Ex. 13. Young issued his decision dismissing Plaintiff in all capacities on or about November 19, 2004. See id. Ex. 14.

Under the applicable labor agreement, the union appealed Young's decision to Mark Hamilton. Hamilton denied the appeal and upheld Plaintiff's dismissal. After Hamilton's decision, the union appealed the matter to Norfolk Southern's labor relations department. A discussion on that appeal was held on March 11, 2005, and by letter dated March 29, 2005, S.R. Weaver, Norfolk Southern's Director of Labor Relations, through Christopher Decker, Assistant Director of Labor Relations, denied the appeal. See id. Ex. 17.

_____

[3] Young was the assistant division superintendent under Mark Hamilton.

[4] Plaintiff denies that the hearing was fair and impartial.

The final step in the grievance resolution mechanism is an appeal to a public law board under the Railway Labor Act. Plaintiff's union appealed his dismissal to Public Law Board No. 6744 which issued a decision dated September 24, 2005, specifically finding that substantial evidence supported Norfolk Southern's conclusion that Plaintiff was responsible for all three of the charges against him. See id. Ex. 18. The Public Law Board also determined that, considering the seriousness of the violations along with the quality and duration of Plaintiff's service, the discipline to date had served its corrective purpose and that Plaintiff would be reinstated. No back pay was awarded. Plaintiff was reinstated to his regular position pending the Public Law Board's decision on July 14, 2005.

### 2. Plaintiff's FMLA Leave, Alleged Harassment, and Safety Complaints

During the course of his employment, Plaintiff applied for leave under the Family and Medical Leave Act ("FMLA") on a number of occasions. During the course of FMLA leave Plaintiff took intermittently during 2003, he alleges that his supervisor, Keller, "harassed" him for using that leave. He also believed he was being harassed because he had resigned his management position to return to a union position. Plaintiff set out his primary complaints with regard to alleged FMLA harassment in a five-page letter to the U.S. Department of Labor dated June 5, 2004. See Defs.' App. Ex. 30. That letter also briefly mentioned alleged national origin and racial discrimination. Plaintiff contends he sent a letter with substantially the same content to the Norfolk Southern EEO Department in early March 2004. Plaintiff does not have a copy of this latter letter and a search of the EEOC office revealed that neither the letter nor any record thereof exists in its files. Norfolk Southern also denies receiving a copy of the letter. The Department of Labor advised Plaintiff by letter dated January 6, 2005 that its investigation did not confirm a violation of the FMLA.

By e-mail dated June 3, 2004, Plaintiff followed up a phone call complaint he made to the Department of Transportation Federal Railroad Administration ("FRA") on that same date

complaining that he had been lied to in a situation involving a train crew working on the Fort Wayne line on June 2, 2004. By letter dated October 25, 2004, the FRA indicated that it had completed its investigation and determined that there was no violation of federal regulations regarding signal maintenance.

Plaintiff testified at his deposition that his retaliation claim is based on the complaint about the FMLA, the complaint about national origin or racial discrimination, and the safety complaints. See Pl. Dep. at 111; see also Complaint ¶ 30.

## B. Procedural History

For purposes of ruling upon the pending Motion, the following procedural history is relevant.

After exhausting his administrative remedies, Plaintiff filed a Complaint against Defendants on January 27, 2006. (Docket No. 1). Defendants answered Plaintiff's Complaint on April 12, 2006. (Docket No. 2). Prior to filing his Complaint, but after he filed his charge of discrimination with the EEOC, Plaintiff filed a Chapter 7 Bankruptcy petition in the United States Bankruptcy Court for the Western District of Pennsylvania, at Bankruptcy No. 05-34922. In his bankruptcy petition, Plaintiff did not list his employment discrimination claim either as a contingent claim in his schedule of assets, or as a suit or administrative proceeding in a Statement of Financial Affairs. On June 6, 2007, I issued and Opinion and Order granting in part Defendants' First Motion for Summary Judgment (Docket No. 14) on an issue related to Plaintiff's bankruptcy. (Docket No. 26). Defendants' First Motion for Summary Judgment was denied as moot with respect to the merits of Plaintiff's case.

After the outstanding bankruptcy-related issues were resolved, Defendants refiled their Motion for Summary Judgment on the merits, Brief in Support, Concise Statement of Material Facts, and Appendix on March 26, 2008. (Docket Nos. 33-35). On April 25, 2008, Plaintiff filed a Brief in Opposition, Counterstatement of Material Facts, and Appendix in opposition to Defendants'

Motion. (Docket Nos. 38-40). Defendants filed a Reply Brief on May 9, 2008. (Docket No. 41). Defendants' Motion is now ripe for my review.

## II. <u>LEGAL ANALYSIS</u>

### A. <u>Standard of Review</u>

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).

In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion. <u>Int'l Raw Materials, Ltd. v. Stauffer Chem. Co.</u>, 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. <u>Chipollini v. Spencer Gifts, Inc.</u>, 814 F.2d 893, 896 (3d Cir. 1987). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. <u>Id</u>. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. <u>Celotex</u>, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine

issue for trial. Id. at 324. Summary judgment must therefore be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988) (quoting Celotex, 477 U.S. at 322).

## B. Plaintiff's Claims Against Defendants

### 1. National Origin Discrimination - Title VII and PHRA[5]

Plaintiff alleges that he was fired by Norfolk Southern because of his national origin (Syrian-American) in violation of Title VII and the PHRA. Norfolk Southern alleges that it is entitled to summary judgment as to Plaintiff's national origin discrimination claims because Plaintiff cannot establish a *prima facie* case of discrimination and/or there is no genuine issue of material fact that Norfolk Southern's reason for discharging Plaintiff was a pretext for discrimination.

Title VII makes it unlawful, inter alia, to "discharge any individual . . . or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove national origin discrimination by direct evidence as set forth in Price Waterhouse v. Hopkins, 490 U.S. 228, 244-46 (1989), or indirectly through the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). "Direct evidence" is evidence sufficient to allow the jury to find that "the decisionmakers placed substantial negative reliance on [national origin] in reaching their decision." Price Waterhouse, 490 U.S. at 277.

Here, Plaintiff argues that two alleged remarks by division superintendent Mark Hamilton constitute direct evidence of national origin discrimination within the meaning of Price Waterhouse:

---

[5]  My analysis of Plaintiff's Title VII claims applies equally to his national origin discrimination claim and his retaliation claims under the PHRA. Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).

8

(1) the remark shortly after Hamilton became superintendent in November 2003 (and well before the termination decision) concerning the number of American flags on Plaintiff's vehicle, and (2) the inquiry as to Plaintiff's thoughts on terrorism after a safety training session. Pl.'s Opp. at 3-4. These remarks, even if made, simply are insufficient to rise to the level of direct evidence under Price Waterhouse. Price Waterhouse itself states that statements made by non-decisionmakers, or by decisionmakers unrelated to the decisional process itself are not direct evidence. 490 U.S. at 277. Hamilton's alleged comments fall into this category.

Because Plaintiff has failed to present direct evidence that the decisionmaker(s) in this case discharged him because of his national origin within the meaning of Price Waterhouse, I will analyze his national origin discrimination claim using the McDonnell Douglas burden-shifting framework. Under that framework, a plaintiff first must establish a *prima facie* case of discrimination. If the plaintiff succeeds, the burden of production then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the defendant meets this minimal burden, then the plaintiff must prove, by a preponderance of the evidence, that the articulated reason was mere pretext for discrimination. McDonnell Douglas Corp., 411 U.S. at 802; Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997). Throughout this analysis, however, the burden of proving intentional discrimination rests with the plaintiff. Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).

### a. *Prima Facie* Case

In order to show a *prima facie* case of discriminatory discharge based on national origin under Title VII and the PHRA, a plaintiff must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for the position he held; and (3) he was discharged under circumstances that give rise to an inference of unlawful discrimination. Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989); Bazargani v. Haverford State Hosp., 90 F. Supp. 2d 643, 650 (E.D. Pa. 2000), aff'd, 33 F.

App'x 647 (3d Cir. 2002); <u>see also</u> <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 410 (3d Cir.1999).

Here, Norfolk Southern argues that Plaintiff has failed to establish the third prong of the *prima facie* case because there is no evidence that the primary decisionmaker in this case, Hearing Officer Young, was aware of Plaintiff's national origin and/or there is no evidence that Norfolk Southern treated similarly-situated employees outside of Plaintiff's protected class more favorably.  Defs.' Br. Supp. (Docket No. 35) at 3-5.  Plaintiff disagrees by (1) arguing that Young's decision was influenced by supervisors Mark Hamilton and Jim Keller, both of whom allegedly were aware of Plaintiff's national origin, and (2) pointing to two other individuals he claims received less severe discipline for similar infractions.  Pl.'s Opp. at 5-10.  Although, for the reasons set forth <u>infra</u>, I find that Norfolk Southern's arguments have some force, I do not need to resolve this question because even assuming *arguendo* that Plaintiff has established a *prima facie* case, his claim cannot survive summary judgment because Norfolk Southern has provided a legitimate, nondiscriminatory reason for its decision to terminate Plaintiff's employment, and Plaintiff cannot point to sufficient record evidence from which a reasonable fact finder could conclude that this reason was a pretext for national origin discrimination.

### b.  <u>Norfolk Southern's Articulated Reason</u>

To satisfy step two of the burden shifting analysis, Defendants must introduce "evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for" the discharge.  <u>Fuentes</u>, 32 F.3d at 763.  Here, Norfolk Southern's articulated reason for terminating Plaintiff's employment is that, in connection with the October 27, 2004 incident, Plaintiff had: (1) failed to issue a "Form D" when needed; (2) engaged in conduct unbecoming an employee, related to falsification of mandatory directive records; and (3) made false and/or conflicting statements to Chief Dispatcher Opalanko.  Hearing Officer Young (who was not aware of Plaintiff's national origin) made the decision to discharge Plaintiff after a lengthy investigative hearing, and Division

Superintendent Hamilton upheld the decision on appeal. Plaintiff's union then appealed the matter to Norfolk Southern's labor relations department, which also denied the appeal. The union further appealed Plaintiff's dismissal to Public Law Board No. 6744, which issued a decision holding that substantial evidence supported Norfolk Southern's conclusion that Plaintiff was responsible for all three charges.

I find that Norfolk Southern has articulated a more than legitimate nondiscriminatory reason for Plaintiff's discharge. See, e.g., Hughes v. City of Bethlehem, No. 07-2349, 2008 WL 4436045, at * 3 (3d Cir. Oct. 2, 2008) (dishonesty); Messina v. E.I. Dupont de Nemours & Co., 141 F. App'x 57, 60 (3d Cir. 2005) (violation of safety rule); Harp v. SEPTA, No. Civ. A. 04-2205, 2006 WL 1517390, at *4 (E.D. Pa. May 31, 2006) (falsifying documentation; conduct unbecoming an employee); Maurizio v. Fox Chapel Foods, Inc., No. 02:04CV1168, 2006 WL 2571397, at *6 (W.D. Pa. Sep. 5, 2006) (insubordination and/or misconduct). Accordingly, the burden of persuasion is on Plaintiff to offer evidence that this proffered reason is pretextual.

### c. Pretext

In order to survive summary judgment when an employer has articulated a legitimate, nondiscriminatory reason for its action, a plaintiff must submit evidence from which a reasonable fact finder could either: (1) disbelieve the employer's articulated legitimate reasons; or (2) conclude that discrimination was more likely than not a motivating or determinative cause of the employer's action. See Fuentes, 32 F.3d at 762; Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 (3d Cir. 1998); see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000).

To discredit the employer's articulated legitimate reasons (the first method of proving pretext), the plaintiff "need not 'produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, nor produce additional evidence beyond [his] prima facie case.'"

Simpson, 142 F.3d at 644 (quoting Fuentes, 32 F.3d at 764-65).

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent or competent. Rather, the non-moving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons.

Fuentes, 32; F.3d at 765 (citations omitted); see also Simpson, 142 F.3d at 644; Keller, 130 F.3d at 1109 ("[T]he plaintiff must show, not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason."); Kautz v. Met-Pro Corp., 412 F.3d 463, 467 (3d Cir. 2005) (plaintiffs must "present evidence contradicting the core facts put forward by the employer as the legitimate reason for its decision").

To show that discrimination was more likely than not a cause for the employer's action (the second method of proving pretext), "the plaintiff must point to evidence with sufficient probative force that a factfinder could conclude by a preponderance of the evidence that" the plaintiff's national origin and/or other protected trait, "was a motivating or determinative factor in the employment decision." Simpson, 142 F.3d at 644. Among other things, the plaintiff may show that the employer: (1) has previously discriminated against him; (2) has discriminated against other persons within the plaintiff's protected class or within another protected class; or (3) that the employer has treated more favorably similarly situated persons not within the protected class. Id. at 645 (citing Fuentes).

The burden of proving pretext is a difficult one, Kautz, 412 F.3d at 467, and one that Plaintiff cannot meet in this case. Although Plaintiff offers several arguments as to why Norfolk Southern's articulated reason for discharge is pretextual, his evidence, both individually and taken as a whole, is insufficient to raise a genuine issue of material fact on this issue.

12

**(1) Alleged Discriminatory Remarks**

As an initial matter, the parties do not dispute that James Young – the hearing officer who conducted the initial investigation and hearing and who found that Plaintiff was responsible for all three alleged violations – was not aware of Plaintiff's national origin at the time of the investigative hearing. Plaintiff argues, however, that supervisors Mark Hamilton and Jim Keller were aware that Plaintiff was of Syrian descent and that they influenced the investigation and Young's decision. Pl.'s Opp. Br. at 3-7, 14-15. As evidence that Hamilton harbored a discriminatory motive, Plaintiff relies heavily on the two alleged comments discussed in the "direct evidence" section supra. Specifically, Plaintiff points to (1) the alleged remark shortly after Hamilton became superintendent in November 2003 (and well before the termination decision) concerning the number of American flags on Plaintiff's vehicle,[6] and (2) Hamilton's alleged inquiry as to Plaintiff's thoughts on terrorism after a safety training session. Id. With respect to Keller, Plaintiff alleges that, in the summer of 2003 (over a year prior to his discharge) Keller intentionally mispronounced his name by emphasizing a Middle Eastern pronunciation. Id. at 9.[7]

Even if true, however, Hamilton and Keller's alleged statements alone are insufficient evidence of pretext. It is well-established in the Third Circuit that "[s]tray remarks by non-decisionmakers or decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." Ezold v, Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992). Here, even if I consider Hamilton and/or

---

[6] Specifically, Plaintiff alleges that Hamilton said to him "Why do you have all of these American Flags on your car, is that so people don't think you are a terrorist?" Pl. Dep. at 47-49.

[7] Plaintiff also makes generic allegations that during the same time period as the name mispronunciation, Keller continually harassed him with respect to his FMLA leave. Allegations of FMLA harassment, however, are not evidence of discriminatory animus based on national origin. Keller's alleged admission that he "did not like" Plaintiff likewise is not evidence that Keller did not like Plaintiff because of his national origin.

Keller to be decisionmakers with respect to Plaintiff's discharge, either because they influenced Young's decision or, in Hamilton's case, because he denied Plaintiff's first appeal of Young's decision, the alleged comments were entirely unrelated to the decision process and were made well prior to the date of the termination decision. Thus, the comments are at best classic "stray remarks" and are not adequate evidence of national origin discrimination. See, e.g., Fuentes, 32 F.3d at 767 (fact commissioner refused to say Plaintiff's name using a Latino pronunciation may reflect on commissioner's insensitivity and unprofessionalism but was not sufficient evidence of bias against Latinos); Pineda v. Philadelphia Media Holdings LLC, 542 F. Supp. 2d 419, 422, 426 (E.D. Pa. 2008) (supervisor's alleged racist statements not evidence of pretext where unrelated to employment decisions either temporally or otherwise); Leung v. SHK Mgmt., Inc., No. Civ. A. 98-3337, 1999 WL 1240961, at *9 (E.D. Pa. Dec. 21, 1999) (ambiguous remark by decisionmaker over ten months before decision and unrelated to decision process was insufficient to show pretext).

### (2) Comparator Evidence

Plaintiff admits that he knows of no other Norfolk Southern employees of a different national origin who were charged with the same three offenses, or any of them individually, and received lesser punishment. Nevertheless, Plaintiff argues that he was disciplined more severely for similar offenses than two other Norfolk Southern employees not within the protected class, Gary Bowling and David Harpster. Pl.'s Opp. Br. at 9-10. This argument is without merit.

Although a plaintiff may use evidence that he was disciplined more severely than employees of a different national origin who committed comparable offenses to show pretext, such evidence is relevant only if the comparators and the plaintiff are "similarly situated." Maull v. Div. of State Police, 39 F. App'x 769, 773 (3d Cir. 2002) (citing Fuentes, 32 F.3d at 765). Although "similarly situated" does not mean "identically situated," the plaintiff generally must demonstrate that he was similar to the alleged comparators in all relevant aspects. See Williams v. Potter, Civil Action No. 07-02, 2008

WL 282349, at *3 (W.D. Pa. Jan. 31, 2008); Red v. Potter, 211 F. App'x 82, 84 (3d Cir. 2006); Ercegovich v. Goodyear Tire & Rubber Co., 154 F.3d 344, 352 (6th Cir. 1998). In the discipline context, a plaintiff must show that the alleged comparator's acts "were of comparable seriousness to his own infraction, and that the [comparator] engaged in the same conduct without such differentiating or mitigating circumstances as would distinguish the [comparator's] conduct or the employer's resulting treatment of [him]." Tyler v. SEPTA, No. Civ. A. 99-4825, 2002 WL 31965896, at *3 (E.D. Pa. Nov.8, 2002) (alterations in original), aff'd, 85 F. App'x 875 (3d Cir. 2003); see also Jackson v. Bob Evans-Columbus, No. 2:04cv559, 2006 WL 3814099, at *7 (W.D. Pa. Dec. 22, 2006); Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002) ("Showing that an employee is similarly situated is no easy task."). Whether alleged comparators are indeed similarly situated is a case-specific analysis, and one which is appropriate for the district court to evaluate at the summary judgment stage. Maull , 39 F. App'x at 769 (citing Simpson, 142 F.3d at 645).

In his Complaint, Plaintiff focuses on Gary Bowling, the dispatcher who, on October 27, 2004, had mistakenly changed the date on the bulletin orders at issue in this case. Complaint ¶¶ 12-13. Specifically, Plaintiff alleges that while he was discharged for his role in the incident, Bowling was not disciplined for his error. Id. It is undisputed, however, that at the time of the incident, Bowling was a probationary employee and, as such, was not subject to all of the rights and obligations afforded to non-probationary employees such as Plaintiff under the applicable labor agreement.[8] Because Bowling was not subject to discipline under the labor agreement, he was not similarly-situated to Plaintiff. Perhaps recognizing this difference, Plaintiff focuses in his brief on his deposition testimony that, on a later occasion, Bowling falsified employee time sheets but was not

---

[8] In addition, although Bowling made a mistake on the bulletin, this is not the same as any of the offenses which Plaintiff was charged.

15

disciplined. Pl. Opp. at 9-10; Pl. Dep. at 78-79. Plaintiff, however, admitted in his deposition that he could not recall whether he ever reported Bowling to management for this alleged conduct, id. at 81, and there is no other evidence that management was aware of this incident.

With respect to the second alleged comparator, train dispatcher David Harpster, Plaintiff testified at his deposition that Harpster committed an "overlap of authority,"[9] affecting both Young and Hamilton, yet was not removed from service as a result of the rule violation. Pl. Opp. at 9; Pl. Dep. at 82-84. Plaintiff's allegations in this regard, however, are based on nothing more than mere speculation and, in any event, the violation he alleges Harpster of committing is not similar to those with which Plaintiff was charged.

In short, I agree with Defendants that Plaintiff's allegations regarding comparator employees are too general and lacking in context to support his discrimination claim. In addition to the fact that Plaintiff does not offer any evidence to back up his claims, the individuals to whom Plaintiff points were not similarly-situated to him and/or did not commit comparable offenses. Therefore, those individuals are not valid comparators for purposes of demonstrating pretext. See, e.g., Jalil, 873 F.2d at 708; Bazargani, 90 F. Supp. 2d at 652.

### (3) Other Arguments

Plaintiff's remaining arguments in support of his pretext theory consist of little more than conclusory allegations, unsupported speculation, and his own subjective beliefs. For example, Plaintiff suggests repeatedly in his opposition papers that the charges Norfolk Southern brought against him themselves were discriminatory and that the hearing was biased. Specifically, Plaintiff contends that Opalanko only amended the initial charge to include the second and third offenses (the more serious offenses) after consulting with Keller and Hamilton whom Plaintiff claims

---

[9] According to Plaintiff, an "overlap of authority" occurs when a dispatcher issues an authority for a train to be on a rail that improperly overlaps other limits that already have been established. Pl. Dep. at 83.

discriminatorily "created" those charges after the fact. Pl. Opp. at 8, 14-16. These allegations, however, are completely unsupported by the record and are based solely on Plaintiff's speculation and subjective beliefs. Such "evidence" simply is not sufficient to withstand a motion for summary judgment on a pretext theory. See, e.g., Jalil, 873 F.2d at 707 (conclusory allegations of discrimination are insufficient to defeat summary judgment); Trap Rock Indus., Inc. v. Local 825, 982 F.2d 884, 891 (3d Cir. 1992) (general, unsupported allegations of harassment and discrimination not enough to overcome summary judgment motion); Bazargani, 90 F. Supp. 2d at 655 & n.22 (bald, unsubstantiated allegations not sufficient); Pineda, 542 F. Supp. 2d at 426 (summary judgment warranted where no evidence of discriminatory motive other than plaintiff's subjective belief) (citing Jones, 198 F.3d 403).[10]

To the extent Plaintiff disagrees with Defendant about the seriousness or appropriateness of the charges against him, such disagreement likewise is not evidence of national origin discrimination. It is well-established that an employee's mere disagreement with his employer's evaluation of his performance or misconduct does not prove pretext. Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991). Similarly, "pretext is not shown by evidence that 'the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" Kautz, 412 F.3d at 467 (quoting Fuentes, 32 F.3d at 765); see also Keller, 130 F.3d at 1109 ("The question is not whether the employer made the best or even a sound business decision; it is whether the real reason is discrimination."); Brewer v. Quaker State Oil Refining Corp., 72 F.3d 326, 332 (3d Cir. 1995)

---

[10] To the extent Plaintiff argues that the timing of the charges itself is evidence of pretext, such argument is without evidentiary support. To the contrary, the record supports Defendants' position that the second and third charges were based on information Opalanko gathered and conversations he had with Plaintiff subsequent to the filing of the initial charge (failure to issue a Form D, Line 5). There also is no evidence to support Plaintiff's belief that Hamilton's revocation of Plaintiff's access privileges pending the hearing was motivated by discriminatory animus. See Pl. Opp. at 14.

("[W]e do not sit as a super-personnel department that reexamines an entity's business decisions.").

For all of these reasons, Plaintiff has failed to demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in Norfolk Southern's proffered reasons for its actions that a reasonable factfinder could rationally find then unworthy of credence. Plaintiff likewise has failed to offer any evidence from which a reasonable jury could conclude that his national origin was more likely than not a motivating or determinative cause of his discharge or any other adverse action. Accordingly, Norfolk Southern's motion for summary judgment as to Plaintiff's national origin discrimination claims is granted.

## 2.  Retaliation - Title VII and PHRA

Plaintiff alleges that Norfolk Southern unlawfully terminated his employment in retaliation for "filing internal complaints for age and national origin discrimination, FMLA violations, safety violations, harassment, and creating a hostile work environment." Complaint ¶ 30; Pl. Dep. at 111. Norfolk Southern seeks dismissal of Plaintiff's retaliation claims in their entirety on the grounds that (1) Plaintiff cannot establish a *prima facie* case of retaliation and/or (2) Norfolk Southern has articulated a legitimate, nondiscriminatory reason for its decision and Plaintiff cannot show that the reason was pretextual.

The same burden-shifting analysis applied to Plaintiff's disparate treatment claim applies equally to his retaliation claim. To establish a *prima facie* case of Title VII retaliation, Plaintiff must show that: (1) he engaged in a protected activity under Title VII; (2) his employer took an adverse employment action against him after or contemporaneous with the protected activity; and (3) a causal link exists between the protected activity and the adverse action. Andreoli v. Gates, 482 F.3d 641, 649 (3d Cir. 2007). Norfolk Southern argues that Plaintiff cannot satisfy prong three of this test, i.e., that a causal connection exists between the protected activity and the discharge.

As an initial matter, I agree with Defendants that the only arguable protected activity in which Plaintiff engaged during the relevant time period was his 2004 letter to the Department of Labor, a copy of which he alleges he sent to Norfolk Southern's EEO office. Defs.' App., Ex. 30.[11] Plaintiff's taking of FMLA leave, his complaints about alleged FMLA harassment, and/or his complaints to the FRA regarding safety issues are not protected activity within the meaning of Title VII. See 42 U.S.C. § 2000e-3(a); Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc., 450 F.3d 130, 135 (3d Cir. 2006) ("Title VII's anti-retaliation provisions protect employees who participate in Title VII's statutory protections or otherwise oppose employment practices made unlawful by Title VII."); Hamner v. St. Vincent Hosp., 224 F.3d 701, 707 (7th Cir. 2000). Cf. Vierra v. Wayne Mem. Hosp., 168 F. App'x 492, 496-97 (3d Cir. 2006) (affirming summary judgment on ADA retaliation claim where employee's complaints were not based on alleged disability discrimination).

I further agree that Plaintiff cannot establish a causal link between this limited protected activity and the termination of his employment in November 2004. First, the timing of the protected activity and the adverse action does not give rise to an inference of causation. The letter to the Department of Labor is dated June 5, 2004, and Plaintiff alleges he sent a copy of the letter to Shari Cohen in Norfolk Southern's EEO office, approximately three months prior to that date . See Defs.' App., Ex. 30. Thus, at a minimum, over five months passed between the alleged protected activity and Plaintiff's discharge. Absent other evidence of a causal connection, this timeframe is simply too attenuated to support an inference of retaliation. See, e.g., Andreoli, 482 F.3d at 650 (five-month time period between protected activity and adverse action was, without additional evidence, insufficient to raise an inference of causation); Urey v. Grove City College, 94 F. App'x 79, 81 (3d Cir. 2004) ("Generally, it can be said that 'if at least four months pass after the protected action

---

[11] The primary purpose of this five-page letter was to report alleged FMLA violations. The letter, however, does contain several brief mentions of alleged national origin discrimination.

without employer reprisal, no inference of causation is created.'" (quoting <u>Woods v. Bentsen</u>, 889 F. Supp. 179, 187 (E.D. Pa. 1995))).

Second, Plaintiff has not offered any other evidence of a causal connection. Instead, he focuses on the temporal proximity argument, contending that the alleged retaliatory acts include not only his November 2004 discharge but also other alleged actions of managerial employees, particularly Keller, throughout the period between his alleged internal EEO complaint and his discharge. Specifically, Plaintiff alleges <u>inter alia</u>, that Keller stood too close to him, failed to provide him with critical job information, and followed him out of the building in an attempt to eavesdrop on a conversation Plaintiff was having with his union representative. Pl. Opp. at 12. Citing <u>Burlington Northern & Santa Fe Railroad Co. v. White</u>, 548 U.S. 53 (2006), Plaintiff contends that these actions also were adverse retaliatory actions giving rise to Title VII liability. I disagree. Even if these actions occurred, Plaintiff does not point to any evidence suggesting a causal connection between those actions and his complaint about national origin discrimination. To the contrary, the record reflects, if anything, that Keller acted in response to Plaintiff's taking of FMLA leave and/or making a safety complaint and that Keller had been engaging in similar harassing behavior well before Plaintiff filed his EEO complaint in 2004. As set forth above, alleged harassment for taking FMLA leave is not actionable under Title VII's anti-retaliation provisions.

Even if Plaintiff could establish a causal connection between his protected activity and his discharge, his claim still fails as a matter of law because, for the same reasons set forth in Section II.B.1, <u>supra</u>, I find that Norfolk Southern has articulated a legitimate, nondiscriminatory reason for its actions and that Plaintiff has failed to offer evidence from which a reasonable jury could conclude that the articulated reason is pretextual. <u>See</u> <u>Hughes</u>, 2008 WL 4436045, at *3. For this reason as well, Plaintiff's retaliation claims cannot survive the instant motion for summary judgment.

### III. **<u>CONCLUSION</u>**

For all of the above reasons, Defendants' Motion for Summary Judgment is granted in its entirety and Plaintiff's Complaint is dismissed with prejudice.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


Bruce D. Saellam,                          )
                                           )
              Plaintiff,                    )
                                           )
       vs.                                 )      Civil Action No.  06-0123
                                           )
Norfolk Southern Corporation, Norfolk      )
Southern Railway Corporation,              )
                                           )
              Defendants.                   )


AMBROSE, Chief District Judge



## ORDER OF COURT

       AND NOW, this 19th day of December, 2008, after careful consideration of the submissions

of the parties and for the reasons set forth in the Opinion accompanying this Order, it is ordered that

Defendants' Motion for Summary Judgment (Docket No. 33) is GRANTED in its entirety and that

Plaintiff's Complaint is dismissed with prejudice.



                                           BY THE COURT:
                                           /s/ Donetta W. Ambrose
_____     Donetta W. Ambrose
                                           Chief U.S. District Judge